UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SONJA C.,[1]

                              Plaintiff,                    DECISION AND ORDER

-vs-

                                                    21-CV-6394 (CJS)

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

_____

## I. INTRODUCTION

In May 2021, Sonja C. ("Claimant") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Commissioner of Social Security's ("Commissioner") denial of her application for Disability Insurance Benefits ("DIB"). Compl., May 21, 2021, ECF No. 1. Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Pl.'s Mot., Jan. 28, 2022, ECF No. 14; Def.'s Mot., Apr. 19, 2022, ECF No. 17. For the reasons set forth below, Claimant's motion for judgment on the pleadings [ECF No. 14] is denied, the Commissioner's motion [ECF No. 17] is granted, and the Clerk of Court is directed to close this case.

## II. BACKGROUND

The Court assumes the reader's familiarity with the facts and procedural history in this case, and therefore addresses only those facts and issues which bear directly on the resolution of the motions presently before the Court.

_____

[1] The Court's Standing Order, issued on November 18, 2020, directs that, "in opinions filed pursuant to . . . 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

A. Claimant's Application

Claimant filed a DIB application in November 2015, alleging a disability onset date of May 1, 2012. Transcript ("Tr."), 308,[2] Sept. 22, 2021, ECF No. 7. In so doing, she indicated that her ability to work was limited by degenerative disc disease, two herniated lumbar discs, sciatic nerve damage, arthritis, spinal stenosis, depression, and anxiety. Tr. 325. In January 2016, the Commissioner denied Claimant's DIB claim at the initial level, stating that "based on your age of 40 years, your education of 12 years, and your experience, you can perform light work (for example, you could lift a maximum of 20 lbs., with frequent lifting or carrying of objects weighing up to 10 lbs., or walk or stand for much of the working day)." Tr. 172.

B. The Hearing Before the First ALJ

After the Commissioner denied her application, Claimant appeared with counsel on May 15, 2018 for a hearing before an Administrative Law Judge ("ALJ"). Tr. 88. In response to the ALJ's question as to whether she had ever thought about looking for work that was less physically demanding and less complicated, Claimant stated:

> There was a time when I thought maybe . . . I could do something and work from home or . . . do something else, but my pain – when I have pain, I have pain. It takes your whole day away.
>
> * * *
>
> . . . I don't think I could show up [at work] every day. I know I couldn't show up there every day, and I know, if I could stand up if I needed to – there's times I need to lay down . . . .

Tr. 115–17.

---

[2] The page references from the transcripts are to the bates numbers inserted by the Commissioner, not the pagination assigned by the Court's CM/ECF electronic filing system.

Regarding her education and work history, Claimant testified that she completed school through the 12th grade, and earned her Licensed Practical Nurse ("LPN") certificate. Tr. 98. Claimant testified that much of her career she worked for Finger Lakes Developmental Disabilities Service Office (DDSO) as a residential aide and then a supervisor. Tr. 96. In both roles, her job was physically demanding: she would assist the mentally or physically disabled residents of the home she worked in by helping to bathe them, shower them, dress them, feed them, brush their teeth, and other similar tasks. Tr. 97. Claimant stated that she first got hurt on the job in 2011, at which time she had back surgery on her disc at L5-S1 and was out for six months. Claimant said she "felt good" when she went back to work, but she "re-herniated" her L5-S1 disc in May 2012 while attending a work-related training class and has not returned to work since. Tr. 99–100.

Following her second injury, Claimant had a second back surgery. Yet even after her second surgery, Claimant continued to have sciatic pain in her lower back and shooting down her left leg. Tr. 102. She testified that three of the toes on her left foot were numb and tingly, and she was very weak in her lower back and her left leg. Tr. 102–03. She stated that she did physical therapy for six to eight months, went to the chiropractor, and had tried pain management for over two years, including epidurals and trigger point injections, but that none of the treatment provided relief. Tr. 103–04.

With respect to her activities of daily living, Claimant testified that she lives with her husband and two sons, one 13 years old and the other 21. Tr. 94. On a typical day, Claimant said she experience a pain level of "about a 4" on a scale of 1 to 10, particularly in the morning. She stated that she has to wake up an hour before she has to get her son up for school because the stiffness in her lower back is such that she can barely move.

3

Tr. 105. Sometimes her husband has to help her out of bed and to the bathroom, and then she reclines in the living room for an hour. After her family leaves for school and work, respectively, her mom comes over and helps once a week with the laundry, vacuuming, mopping, and heavy housework. Tr. 107. Claimant stated that throughout the day she's usually in the living room in the recliner because elevating her legs provides relief from the pressure on her lower back. Tr. 110. She can cook dinner because her husband moved the pots and pans to a cupboard that Claimant can access without bending down, but it hurts Claimant to bend and use the oven. Tr. 118. She said that she can probably stand for around 45 minutes at any one time, walk for approximately 30 minutes, and sit upright in a chair "[o]n a good day, probably 45 minutes to an hour." Tr. 119–120. Yet she also stated that she had bad days three to four times a week when she has to just sit down or lay down all day. Tr. 120.

    In addition to Claimant's testimony, the ALJ also took testimony from an impartial vocational expert (VE) at the hearing. Using the Dictionary of Occupational Titles (DOT), the VE classified Claimant's position as a residential care aide and residential supervisor, both of which were at the medium level of exertion as performed. Tr. 122–23. The ALJ assumed Claimant would not be able to perform past relevant work, and proposed a hypothetical individual to the VE that included a sedentary range of work with some exertional and mental limitations. Tr. 123–24. The VE testified that there were jobs in significant numbers in the national economy that the person could perform, including an inspector, a packager, and a sorter. Tr. 124. However, the VE testified that an employee would be terminated if that individual was not able to maintain on task behavior for at least 90% of the workday, that an unexcused absence of more than 1 day per month would

4

preclude employment, and that the listed positions would not accommodate an individual who needed to elevate her lower extremities to waist level periodically throughout each day. Tr. 126.

## C. The First ALJ's Decision

In June 2018, the ALJ concluded that the Claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), with the following limitations:

> [L]ifting/carrying up to ten pounds occasionally, sitting for six hours, and standing/walking two hours in an eight-hour workday. After thirty minutes of sitting, the claimant has the option to stand for five minutes, remaining on-task. She must avoid climbing ladders, ropes or scaffolds, crawling, kneeling or crouching. She is limited to occasional stooping and climbing ramps/stairs. The claimant must avoid balancing on wet or vibrating surfaces, as well as unprotected heights, pushing/pulling or operating foot controls. Mentally, the claimant is limited to performing simple work tasks in a nonfast/non-assembly line type production-paced setting, involving only occasional interaction with the public, coworkers and supervisors. She is able to make simple work-related decisions and adapt to simple changes in a routine setting.

Tr. 150. Based on this RFC, as well as Claimant's age, education, and work experience, the ALJ found that there were jobs that exist in significant numbers in the national economy that Claimant can perform, and hence that she was not disabled. Tr. 157.

Claimant appealed the ALJ's decision to the Commissioner's Appeals Council, and the Appeals Council vacated the ALJ's decision and remanded the matter for further proceedings. Tr. 165. Specifically, the Appeals Council found that the ALJ's decision "did not adequately address" opinion evidence from orthopedic surgeon Dr. Gregory B. Shankman, who opined that Claimant required the option to sit and stand at her own volition. Tr. 165–66.

D. The Hearing Before the Second ALJ

In March 2020, Claimant appeared with her attorney for a hearing before a different ALJ. Tr. 38. At this hearing, Claimant's attorney argued that Claimant's severe impairments were "the lower back pain, status post the two surgeries . . . [and] limitations from major depressive disorder . . . ." Tr. 53. Claimant's testimony was similar to the first hearing. She stated that she continued to have lower back and leg pain, that the treatments she tried – including physical therapy, injections, and a spinal cord stimulator – had been ineffective, and that her doctor told her she would probably need a third spine surgery to have her spine fused. Tr. 60–61. She also testified that she is able to shower herself, do most of the cooking (using pots and pans that she can retrieve without stooping), grocery shop for herself and family if she doesn't need a lot of groceries, and use her hands to button her shirt, use her phone, or buckle her belt. Tr. 62–66. However, her family has to do the cleaning and vacuuming, she has trouble turning her neck when she drives, and she can only lift about 10 pounds. *Id*. With respect to her depression, Claimant testified that there are days where she doesn't want to do anything or be around anybody. Tr. 70.

In addition to Claimant's testimony, the ALJ again heard from an impartial VE, and the testimony was similar to the first hearing. In response to the ALJ's questions about a hypothetical individual with an RFC similar to the RFC he ultimately found for Claimant, the VE testified that the individual would not be capable of performing Claimant's past relevant work, but that there were significant numbers of jobs in the national economy that such a person could perform, such as an assembler, a hand packager, and an inspector. Tr. 79. The VE testified that, based on his experience, these positions were

able to accommodate a changing of position from sitting to standing, but only if the change was at least 20 to 25 minutes apart. Tr. 79–80.

B. The Second ALJ's Decision

On August 5, 2020, the second ALJ issued a decision in which he concluded that Claimant was not disabled, and hence not entitled to DIB benefits. Tr. 29.

At the outset, the ALJ noted that the matter had been remanded by order of the Appeals Council for further consideration of Claimant's RFC and further evaluation of the opinions in the record from Dr. Gregory Shankman. Tr. 18. Thereafter, the ALJ found that Claimant met the insured status requirements for DIB benefits[3] through December 31, 2018. Tr. 20. Then, at step one of the Commissioner's "five-step, sequential evaluation process,"[4] the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged disability onset date of May 1, 2012. Tr. 20.

---

[3] Claimants must meet the insured status requirements of the Social Security act to be eligible for DIB benefits. See 42 U.S.C. § 423(c); 20 C.F.R. § 404.130.

[4] In addition to the insured status requirements for DIB benefits, the Social Security Administration has outlined a "five-step, sequential evaluation process" that an ALJ must follow to determine whether a claimant has a "disability" under the law:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. § 404.1520(a)(4)(i)–(v), § 416.920(a)(4)(i)–(v)). The claimant bears the burden of proof for the first four steps of the process. 42 U.S.C. § 423(d)(5)(A); *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). At step five, the burden shifts to the Commissioner only to demonstrate that there is other work in the national economy that the claimant can perform. *Poupore v. Asture*, 566 F.3d 303, 306 (2d Cir. 2009).

At step two, the ALJ determined that Claimant has had the following severe impairments: lumbar degenerative disc disease with radiculopathy, sciatica, major depressive disorder, anxiety disorder, and migraine headaches. Tr. 20. At step three, he considered Listing 1.04 for Claimant's spine impairments, 11.00 for her headaches, and 12.04 and 12.06 for her mental impairments, but found that the severity of Claimant's physical or mental impairments did not meet or medically equal the criteria of listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 25–26. With respect to Claimant's mental impairments, the ALJ performed the "special technique"[5] and found that they caused only mild limitations in Claimant's ability to understand, remember, and apply information, and for adapting or managing herself; and moderate limitations in Claimant's ability to interact with others, and concentrate, persist, or maintain pace. Tr. 21–22.

Then, before proceeding to step four, the ALJ carefully considered the entire record and determined that Claimant had the residual functional capacity[6] ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with the following

---

[5] When a claimant alleges a mental impairment, the Commissioner's regulations require the ALJ to apply a "special technique" at the second and third steps of the five-step evaluation process. *Petrie v. Astrue*, 412 F. App'x 401, 408 (2d Cir. 2011) (citing 20 C.F.R. § 404.1520a). First, the ALJ must evaluate the claimant using "Paragraph A" criteria to evaluate the claimant's pertinent symptoms, signs, and laboratory findings and determine whether he or she meets the requirements of one of the mental impairments listed in 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00 ("App'x 1, § 12.00"). *See* 20 C.F.R. § 404.1520a(b)(1). If the claimant does have such an impairment, the ALJ must assess the claimant's limitations in four broad areas of mental functioning that constitute the Paragraph B criteria: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself (collectively, the "Paragraph B criteria"). 20 C.F.R. § 404.1520a(c)(3).

The ALJ must rate the degree of the claimant's limitation in each of the Paragraph B criteria using a five-point scale: none, mild, moderate, marked, or extreme. 20 C.F.R. § 404.1520a(c)(4). To satisfy the "Paragraph B" criteria, a claimant's mental disorder must result in extreme limitation of one, or marked limitation of two, of the four criteria. App'x 1, § 12.00F(2). After rating the degree of functional limitation resulting from the claimant's mental impairment(s), the ALJ must then determine the severity of the mental impairment(s). 20 C.F.R. § 404.1520a(d).

[6] "Residual functional capacity" ("RFC") means the most that the claimant can still do in a work setting despite the limitations caused by the claimant's impairments. 20 C.F.R. § 404.1545, § 416.945.

limitations:

> [S]he requires a job that can be performed regardless of position, either sitting or standing, and she can change position every 30 minutes. She cannot climb a rope, scaffold, or ladder; cannot balance on narrow, slippery or moving surface; and cannot kneel or crawl. She can occasionally, but not repetitively, stoop; crouch; operate foot pedals, and push or pull, and climb stairs or ramps. She needs to avoid vibrations and hazards, such as open waters or unprotected heights. She can perform simple, unskilled work, adjust to occasional changes in work setting, and make occasional simple work-related decisions. She can occasionally interact with the public, but cannot perform teamwork or tandem work. She can work to meet daily goals, but not maintain an hourly, machine-driven, assembly line production rate. She requires up to three short, unscheduled less than 5-minute breaks in addition to the regularly scheduled breaks, for a total of 15 minutes.

Tr. 22.

Based on this RFC, on Claimant's age and education, and on the testimony of the impartial VE, the ALJ found at step four that Claimant was not capable of performing her past relevant work as a residential care aide or residential supervisor. Tr. 27. However, the ALJ found that significant numbers of other jobs existed in the national economy that Plaintiff could perform, such as an assembler, a hand packager, and an inspector. Tr. 28. Consequently, the ALJ determined that Claimant was not disabled, and not entitled to DIB benefits. Tr. 29.

On April 29, 2021, the Commissioner's Appeals Council denied Claimant's request to review the second ALJ's decision. Tr. 1. The second ALJ's decision thus became the "final decision" of the Commissioner.

### III. LEGAL STANDARD

Under 42 U.S.C. § 423(d), a claimant is disabled and entitled to disability insurance benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or has lasted or can be expected to last for a continuous period of not less than 12 months.'" 42 U.S.C. § 405(g) defines the process and scope of judicial review of the Commissioner's final decision as to whether a claimant has a disability that would entitle him or her to an award of benefits. The fourth sentence of § 405(g) empowers the reviewing court to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." The sixth sentence authorizes the reviewing court to "order additional evidence to be taken before the Commissioner of Social Security . . . upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *See Tirado v. Bowen*, 842 F.2d 595 (2d Cir. 1988).

"The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the [Commissioner], and to reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having rational probative force." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (internal citation and quotation marks omitted). Therefore, it is not the reviewing court's function to determine *de novo* whether the claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012). Rather, "[t]he threshold question is whether the claimant received a full and fair hearing." *Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018). Then, the reviewing court must determine "whether the Commissioner applied the correct legal standard[s]." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). Provided the claimant received a full and fair hearing, and the correct legal standards are

applied, the district court's review is deferential: a finding by the Commissioner is "conclusive" if it is supported by "substantial evidence." 42 U.S.C. § 405(g).

"Whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal citation and quotation marks omitted). Consequently, once an ALJ finds facts, a reviewing court can reject those facts only if a reasonable factfinder would have to conclude otherwise. *See Brault*, 683 F.3d at 448.

## IV. DISCUSSION

In her motion for judgment on the pleadings, Claimant raises four legal issues for the Court's review. Pl. Mem. of Law, Jan. 28, 2022, ECF No. 14-1. First, Claimant argues that the ALJ failed to comply with the Appeals Council's remand order by not reconciling Dr. Shankman's medical opinions with his RFC. Pl. Mem. of Law at 12–15. Second, Claimant maintains that the ALJ failed to apply the treating physician rule to his analysis of the opinion evidence from Claimant's primary care physician, Dr. Marino Tavares. Pl. Mem. of Law at 15–21. Third, Claimant maintains that the ALJ failed to apply the correct legal standard to the "joint opinion" of Claimant's mental health therapist and her supervising psychiatrist. Pl. Mem. of Law at 22–26. Lastly, Claimant argues that the ALJ failed to evaluate Claimant's symptoms under the correct legal standard. Pl. Mem. of Law at 27–29. The Commissioner maintains that the ALJ properly evaluated the totality of the evidence, and supported his conclusions with substantial evidence. Def. Mem. of Law, Apr. 19, 2022, ECF No. 17-1.

A. The ALJ's Compliance with the Appeals Council's Remand Order

As discussed above, the Appeals Council in this case vacated the hearing decision by the first ALJ and remanded the matter for consideration by a second ALJ. Tr. 165. In its decision, the Appeals Council observed that the first ALJ accorded "partial weight" to orthopedist Dr. Gregory B. Shankman's opinion overall, but did not explain why he did not adopt Dr. Shankman's opinion that the Claimant requires the option to sit and stand at will. Tr. 165. Instead, the first ALJ's RFC determination provided that "[a]fter thirty minutes of sitting, the claimant has the option to stand for five minutes, remaining on-task." Tr. 150. Accordingly, the Appeals Council directed that, upon remand, the ALJ:

> Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 as well as Social Security Rulings 85-16 and 96-8p). In so doing, further evaluate Dr. Shankman's opinions, pursuant to 20 CFR 404.1527, and explain the weight given to this opinion evidence. As appropriate, the Administrative Law Judge may request that Dr. Shankman provide additional evidence and/or further clarification of his opinions with a medical source statement about what the claimant can still do despite her impairments (20 CFR 404.1520b and 416.920b ).

Tr. 166.

In his decision of August 5, 2020, the second ALJ gave Dr. Shankman's opinion "some weight," but his RFC determination again conflicted with Dr. Shankman's opinion. Tr. 26. Whereas Dr. Shankman opined that Claimant required the option "to sit and stand at her own volition" (Tr. 714), the ALJ's RFC determination provided that Claimant "requires a job that can be performed regardless of position, either sitting or standing, and she can change position every 30 minutes" (Tr. 22). Claimant now argues before this Court that the ALJ failed to comply with the Appeals Council remand order, because the

12

second ALJ repeated the same error as the first ALJ.

*Legal Principles*

20 C.F.R. § 404.977(a) and (b) provide that the Appeals Council "may remand a case to an [ALJ] . . . [if] additional evidence is needed or additional action by the administrative law judge is required," and that the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." An ALJ's failure to comply with the Appeals Council's order constitutes legal error that necessitates a remand. *King v. Colvin*, No. 18-CV-6586-MJP, 2020 WL 1080411, at *3 (W.D.N.Y. Mar. 6, 2020) (collecting cases in support of the proposition that "[a]n A.L.J.'s failure to comply with the Appeals Council's remand order . . . constitutes reversible error.").

*Application*

The Court disagrees with Claimant's argument that the ALJ failed to comply with the Appeals Council's remand. To be sure, both the first and the second ALJ assigned only "partial" or "some" weight to Dr. Shankman's opinion as a whole, and both the first and the second ALJ declined to adopt Dr. Shankman's specific opinion that Claimant "would need to sit and stand at her own volition." However, unlike the first ALJ, the second ALJ's treatment of Dr. Shankman's opinion is in compliance with the regulations for the treatment of opinion evidence in 20 C.F.R. § 404.1527, and his determination that Claimant can change position from sitting or standing every 30 minutes is adequately explained by his RFC discussion.

Because Claimant's original claim was filed well before March 27, 2017, the ALJ was required to weigh opinion evidence using the factors outlined in § 404.1527(c), including: examining relationship, treatment relationship, supportability, consistency, specialization, and other relevant factors. Here, the second ALJ noted that Dr. Shankman "examined claimant for Worker's Compensation purposes on three occasions," that his opinions reflecting Claimant's improved function were consistent with Claimant's treatment records, and in the subsequent paragraph that Dr. Shankman was a "specialist." Tr. 26. Nevertheless, the second ALJ noted that Dr. Shankman's opinion "did not list any specific restriction as to how long the claimant could sit or stand," and that he "did not opine how frequently the claimant would need to rest or for how long she would need to rest." Tr. 26. Because Dr. Shankman was not Claimant's treating physician, this analysis of his opinion was adequate to explain why the second ALJ gave the opinion only "some" weight. *See, e.g., Pappas v. Saul*, 414 F. Supp.3d 657, 675 (S.D.N.Y. 2019) (collecting cases to support the proposition that the same rule requiring that the ALJ provide "good reasons" to justify the weight given to a treating source's opinion does not apply to non-treating sources).

Additionally, throughout his discussion of his RFC determination, the second ALJ "provided an appropriate rationale," supported by substantial evidence, for Claimant's assessed limitations. With respect to Dr. Shankman's opinion, the second ALJ pointed out that claimant had completed an assessment form that indicated she could sit, stand, walk for 8 hours per day, and that his three examinations over three years reflected Claimant's "improved function." Tr. 26 (citing Tr. 707). The ALJ also cited Claimant's consultative medical examination in 2016, after which the only limitations identified by the

examiner were "moderate limitations lifting, carrying, bending, standing and walking" (Tr. 23–24 citing Tr. 763), as well as treatment notes from Claimant's 2018 visit to the Finger Lakes Bone and Joint Center which indicated that she "is currently working without restrictions and will continue to do so" (Tr. 24 citing Tr. 1254). Lastly, the ALJ noted that Claimant's treating physician, Dr. Tavarez, opined that Claimant could sit, stand, or walk for at least 30 minutes at a time, which was not inconsistent with the record. Tr. 26 (citing Tr. 908, 1280). This explanation was adequate. *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

B. The ALJ's Application of the Treating Physician Rule

In May of 2018, Claimant's treating physician, Dr. Tavarez, completed an "Evaluation of Physical Work Limitations." Tr. 907–09. Dr. Tavarez diagnosed Claimant with "chronic low back pain with sciatica," and indicated that the impairment has lasted for at least 12 consecutive months. Tr. 907. He also indicated that, as a result of her impairment, Claimant can lift less than ten pounds, is likely to be absent from work about four days per month, and should only work three days per week, four hours per day. Tr. 908–09.

In his discussion of the opinion evidence, the second ALJ discussed the opinions of consultative medical examiner Dr. Mohammed Zaman and treating physician Dr. Tavarez in the same paragraph. The ALJ gave Dr. Zaman's opinion great weight because it was supported by his examination findings, and was consistent with the other evidence

of record. Tr. 26. By contrast, the ALJ gave Dr. Tavarez's opinion "lesser weight" because Dr. Tavarez opined that the condition had been consistent since 2012 even though he only started treating her in 2016, and because "other than noting the claimant's complaints of pain, [Dr. Tavares] identifies no findings or clinical signs that would support those restrictions." Tr. 26. The ALJ also noted that Dr. Tavarez's opinion was inconsistent with Dr. Shankman's opinion, and the opinion of independent medical examiner Thomas LeTourneau. Tr. 26 (citing Tr. 704–15; 1193–1225).

In her motion for judgment on the pleadings, Claimant argues that the ALJ failed to give any legally sufficient reasons for giving Dr. Tavarez's opinion lesser weight, and that the phrase "lesser weight" is itself legally improper. Pl. Mem. of Law at 17.

*Legal Principles*

20 C.F.R. § 404.1527(c) provides in pertinent part that, for all claims filed before March 27, 2017, the opinion of a treating physician is afforded "controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *See also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). Nevertheless, "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record . . . . Genuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted). Regardless of the weight assigned, the ALJ must "always give good reasons" in his decision for the weight given to a treating source's medical opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)).

In *Estrella v. Berryhill*, 925 F.3d 90 (2d Cir. 2019), the Second Circuit explained the procedure an ALJ should use to determine the appropriate weight to assign a treating physician's opinion:

> First, the ALJ must decide whether the opinion is entitled to controlling weight. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, it must "explicitly consider" the following, nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)).
>
> An ALJ's failure to "explicitly" apply the *Burgess* factors when assigning weight at step two is a procedural error. *Selian*, 708 F.3d at 419–20. If "the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment]," we are unable to conclude that the error was harmless and consequently remand for the ALJ to "comprehensively set forth [its] reasons." *See Halloran*, 362 F.3d at 33. If, however, "a searching review of the record" assures us "that the substance of the treating physician rule was not traversed," we will affirm. *See id*. at 32.

*Estrella*, 925 F.3d at 95–96.

*Application*

The Court disagrees with Claimant's argument that the second ALJ failed to heed the treating physician rule. To begin with, the Court is not persuaded that it was legal error to have given Dr. Tavarez's opinion "lesser weight" where the ALJ clearly articulated his reasons for discounting it. More to the point, Claimant's contention that the ALJ failed to

apply the *Burgess* factors is mistaken.

As indicated above, ALJs who decline to give a treating physician's opinion controlling weight must "explicitly consider": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citation omitted). The ALJ did so in the present case.

The ALJ considered the nature of the treatment relationship by pointing out that Dr. Tavarez only began treating Claimant in 2016, four years after her second back surgery. Tr. 26. He also pointed out that other than Claimant's complaints, Dr. Tavarez "identifies no findings or clinical signs" to support the restrictions he listed. Indeed, a searching review of the record shows that the primary focus of Dr. Tavarez's treatment of Plaintiff was first for a cough and difficulty breathing (November 2016 ,Tr. 996), then to help her quit smoking (February 2017, Tr. 1052), and finally to lose weight (2018, Tr. 1444). To be sure, Dr. Tavares reported complaints of back pain (Tr. 1014), and several of his objective examinations indicate a limited range of motion in her back or that Claimant's musculoskeletal exam was "positive for arthralgias and back pain" (Tr. 1444), but Plaintiff does not identify – and the Court did not perceive – any findings in his treatment notes that supported the severe restrictions he included in his opinion.

Finally, the ALJ considered the consistency of Dr. Tavarez's opinion with the other evidence in the record. First, he noted that Dr. Tavarez's opinion is inconsistent with the opinions of Dr. Shankman, a certified orthopedic surgeon, and Dr. Letourneau, a psychiatrist. Dr. Shankman, after his third examination of Claimant opined that Claimant

18

is capable of working at a "modified duty level" (Tr. 714), and Dr. Letourneau concluded after a psychiatric exam and a battery of tests that Claimant did have a depressive disorder, but that the testing indicated some level of exaggeration of her pain and that her "allegations of functional impairment are not credible." Tr. 1206, 1209. Further, he rightly observed that Dr. Tavarez's opinion that Claimant could sit, stand, or walk for at least 30 minutes was not inconsistent with other evidence in the record.

Claimant also argues that it was error to reject Dr. Tavarez's opinion "just because it is retrospective," that the ALJ had a duty to develop the record if he found that Dr. Tavarez's opinion was insufficiently supported by findings or clinical signs, that the ALJ's decision was improper cherry picking of the record, and that the ALJ improperly gave greater weight to consultative medical examiner Dr. Zaman's opinion. Pl. Mem. of Law at 18–19. These arguments are without merit.

First, the ALJ did not completely reject Dr. Tavarez's opinion as retrospective, but rather considered the lack of a treatment relationship between 2012 and 2016 as one "non-exclusive" *Burgess* factor among many in determining how much weight to give the opinion. Second, the ALJ did not find that there was a gap in the record, but that Dr. Tavarez's opinion was not sufficiently supported; the ALJ "is not required to develop the record any further when the evidence already presented is adequate" for the ALJ to make a determination. *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018). Third, as indicated above, the Court finds that the ALJ's RFC determination was supported by substantial evidence. It is well-settled that a reviewing court cannot find error where there was substantial evidence in the record supporting the ALJ's decision, even if there was also substantial evidence to support a ruling the other way. *See DeChirico v. Callahan*, 134

F.3d 1177, 1182–83 (2d Cir. 1998). Lastly, an ALJ's decision may be supported by substantial evidence where it "largely relied on the report of a consultative examiner," particularly where – as here – the treating physician's opinion "was not accompanied by clinical findings designed to support his conclusory description." *Trepanier v. Comm'r of Soc. Sec. Admin*., 752 F. App'x 75, 77–79 (2d Cir. 2018).

C. The ALJ's Assessment of the "Joint Opinion" of Therapist Amy Shoff and Dr. Rusu

The record contains an "Evaluation of Mental Work Limitations" signed by Dr. Iustinian Rusu, M.D., and Amy Shoff, Licensed Master Social Worker ("LMSW"). Tr. 1145–48. The evaluation indicated that Claimant had been diagnosed with major depressive disorder, that her combination of chronic pain and significant depression made it likely that her condition would deteriorate under the stress of a job, and that she would be likely to miss more than four days per month as a result of her impairment. Tr. 1147–48. The evaluation also indicated that Claimant had marked limitations in her ability to sustain concentration, and to handle the stress of a work setting. Tr. 1146–47.

In addition, the record contains a letter from September 2018 that was written by LMSW Shoff and signed by her and Dr. Rusu. Tr. 1257. The letter indicates that LMSW Shoff has been Claimant's mental health therapist since September 2016, and that she has seen Claimant for therapy for her depression once every 2-3 weeks. Tr. 1257. LMSW Shoff opined that Claimant's symptoms "necessitate" a diagnosis of "mood disorder due to a physiological condition with major depressive type features." Tr. 1257. LMSW Shoff indicated that Dr. Rusu was in agreement with the diagnosis. Tr. 1257.

In his decision, the ALJ gave these opinions "some weight" because he found support in the record "for mild to moderate limitations in these functional areas," but that

"[t]he findings of marked or extreme limitation are not consistent with the claimant's treatment history." Tr. 27. He also stated that although Dr. Rusu signed the opinions, there is no indication in the record that Dr. Rusu ever directly treated Claimant. Tr. 27. Claimant characterizes the February 2018 evaluation and the September 2018 letter as "joint opinions" of LMSW Shoff and Dr. Rusu, and maintains that the ALJ committed legal error by failing to evaluate these joint opinions using the standards for the opinion of a treating physician. Pl. Mem. of Law at 26.

However, a careful review of the ALJ's decision and the record in this case demonstrates that the Claimant's argument in this regard is without merit. Claimant maintains that the ALJ "does not show consideration of the extensive (39) therapy sessions that Ms. Shoff provided between October 2016 and February 2020." Pl. Mem. of Law at 26. That is incorrect. In fact, the ALJ devoted a large portion of his RFC discussion to Claimant's treatment with LMSW Shoff. He observed that the treatment began two weeks after she had been denied participation in the spinal cord stimulator trial in 2016, and that the notes from her early sessions reflected "several psychosocial stressors" but that she was able to process them and cope such that by May 2017 her mood had visibly improved. Tr. 25 (citing Tr. 925, 954).

The ALJ also noted that Claimant's quarterly reviews with LMSW Shoff between November 2017 through March 2018 showed struggles with depression due to her pain, but that "the treatment notes confirm that the claimant's mood has improved and . . . therapy was a tool that reduced her depression." Tr. 25 (citing Tr. 1155–69). Finally, the ALJ noted that Claimant ceased attending counseling sessions in January 2019, that she was discharged from the treatment program in May 2019 after achieving most of her

goals, but that she sought to return to counseling in December of 2019. Tr. 26 (citing Tr. 1282–1352). Based on this history, the ALJ concluded that "it is reasonable to limit [Claimant] to simple work tasks in a non-fast . . . production pace setting, involving occasional interaction with the public, coworkers, and supervisors." Tr. 26. In short, the record reflects the ALJ's thoughtful consideration of Claimant's mental health history and treatment history with LMSW Shoff, and RFC adjustments to account for the limitations reflected in the record.

Moreover, a searching review of the record reveals that the substance of the treating physician rule has not been traversed. *Estrella*, 925 F.3d at 95–96. The ALJ's decision demonstrated that he had reviewed Claimant's treatment history with LMSW Shoff, and that he was not able to discern any form of treatment relationship with Dr. Rusu. He discussed the evidence upon which his RFC restrictions were based, and evaluated LMSW Shoff's and Dr. Rusu's "joint opinions" in the context of both Claimant's treatment history with LMSW Shoff, and of the other evidence of mental health restrictions in the record, including the opinion of consultative psychological examiner Dr. Luna (Tr. 24–25, citing Tr. 767–71), and the statements of Claimant's mother and husband (Tr. 27 citing Tr. 359–65).

Accordingly, the Court finds no legal error in the ALJ's treatment of LMSW Shoff's and Dr. Rusu's "joint opinions."

D. The ALJ's Evaluation of Claimant's Symptoms

In summarizing Claimant's symptoms in his decision, the ALJ stated that "claimant alleges that she injured her back in work-related incidents and has continued to experience pain and limitations that prevent her from working. The claimant also asserts

that her pain has contributed to depression and anxiety that further affect her ability to work." Tr. 23. Nevertheless, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." Tr. 23. Claimant argues that the ALJ erred by not giving good reasons for his symptom evaluation, and failing to articulate specific reasons to enable the court to assess how her symptoms were evaluated. Pl. Mem. of Law at 28.

*Legal Principles*

As the Second Circuit has stated,

> Evidence of pain is an important element in the adjudication of DIB and SSI claims, and must be thoroughly considered in calculating the RFC of a claimant. *See Lewis v. Apfel*, 62 F. Supp.2d 648, 657 (N.D.N.Y. 1999). "[S]ymptoms, including pain, will be determined to diminish [a claimant's] capacity for basic work activities to the extent that ... [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). To that end, the Commissioner has established a two-step inquiry to evaluate a claimant's contentions of pain. *See* Social Security Ruling 96–7P, 1996 WL 374186 (S.S.A.); 20 C.F.R. § 404.1529(c). First, the ALJ must determine whether the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce" the pain alleged. 20 C.F.R. § 404.1529(c)(1); *see* SSR 96–7P. Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry. See 20 C.F.R. § 404.1529(c)(3)(i)–(vii); *Taylor v. Barnhart*, 83 Fed. Appx. 347, 350–51 (2d Cir. 2003) (summary order).

*Meadors v. Astrue*, 370 F. App'x 179, 183–84 (2d Cir. 2010) (footnote omitted). "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . ." 42 U.S.C. § 423(d)(5)(A). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment."

23

*Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999).

*Application*

The Court finds no error in the ALJ's assessment of Plaintiff's subjective complaints. In his decision, the ALJ made repeated, specific reference to Plaintiff's complaints regarding her pain and other limitations: he noted Claimant's reports to consultative medical examiner Zaman of low back pain radiating down to her leg, and migraine headaches (Tr. 23); he referenced her multiple attempts at "interventional pain management treatments," and the discomfort she continued to feel after the treatments (Tr. 24); he discussed her "symptoms of dysphoric mood, sleep and appetite disturbance, crying spells, loss of usual interests, irritability, social withdrawal, panic attacks, fatigue, difficulty concentrating and emotional lability" (Tr. 24); and her complaints of pain throughout her treatment with LMSW Shoff (Tr. 25). Taking all of this evidence into account, as well as the objective evidence in the record which has been discussed above, the ALJ concluded that Claimant's symptoms were not entirely consistent with the objective evidence. Tr. 23. The ALJ's decision provides sufficient detail regarding the ALJ's analysis and findings, and the findings were supported by substantial evidence. *See, e.g., Corbiere v. Berryhill*, 760 F. App'x 54, 58 (2d Cir. 2019) (citing *Genier*, 606 F.3d at 49 in support of its refusal to "second-guess" an ALJ's resolution of conflicts between the claimant's reports of pain and other evidence in the record where the ALJ's determination is supported by substantial evidence). Consequently, the Court declines to find that the ALJ's analysis of Claimant's symptoms was deficient.

CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Claimant Sonja C.'s motion

for judgment on the pleadings [ECF No. 14] is denied, the Commissioner's motion for judgment on the pleadings [ECF No. 17] is granted, and the Clerk of Court is directed to close this case.

DATED:       March 30, 2023
             Rochester, New York

CHARLES J. SIRAGUSA
United States District Judge